in number 22-2101, and all the related pieces in Re Fairfield Sentry Limited. We'll just wait for everybody to shuffle out. Okay, Mr. Clement. Thank you, Your Honors, and may it please the Court, Paul Clement for the Foreign Representatives. I'm going to endeavor to save five minutes for rebuttal. Chapter 15 of the Bankruptcy Code is designed to facilitate the efforts of foreign representatives in vindicating rights available under foreign law. To that end, foreign representatives have pursued relief under BVI statutory and common law to obtain some level of justice for the victims of the Madoff-Ponzi scheme. Unfortunately, the courts below interpreted the code, BVI law, and the party's foreign selection clause to frustrate those efforts at virtually every turn. Especially in light of the CITCO fraud, these claims are valid under BVI law, and the code is best read to facilitate, not frustrate, their success in the U.S. courts. Now, the first error in the decision below is the invocation of the safe harbor of Section 546E as an obstacle to bringing statutory avoidance claims under BVI law. Section 546E, by its terms, limits only the specific avoidance powers granted by the U.S. Code. Well, by its terms, it doesn't do that, right? It says notwithstanding those sections, the trustee may not avoid a transfer that is a settlement payment and so on. Well, that doesn't mean that it's only if you act pursuant to those sections. It says, you know, it gives the notwithstanding clause, but then it has a statement of a rule. The trustee may not avoid a transfer that is a margin payment or a settlement payment and so on. So just by the plain text, why would it be limited to that? So two answers, Your Honor. One is merit management addressed that, I think, specifically, and held that really you have to look at that notwithstanding clause as tying those two together. That was the whole debate in merit management. The losing side was trying to look at 546E in isolation, and the court unanimously said you can't do that. The notwithstanding clause ties the avoidance powers together with 546E. But if I could suggest maybe the starting point is what does the code mean in 561D when it refers to avoidance powers? Because to me, that's the first logical question here. And it seems to me the right answer is when 561D refers to avoidance powers, and they shall be available to the same extent as in a Chapter 7 or a Chapter 11, or limited to the same extent as in Chapter 11 or Chapter 7. Yeah, limited to the same extent. So the avoiding powers there, it seems to me, are best read as the U.S. Code avoiding powers. Now, the district court rejected that interpretation and said no. They also include avoiding powers under foreign statutory law. Why would it be best read to apply to the – it doesn't make – this section, 561D, doesn't make any reference to other statutory avoidance powers. It just says in Chapter 15 there's going to be the same limitation on avoidance powers that would exist in a proceeding under Chapter 7 or 11. Sure, but in Chapter 7 and Chapter – So you're saying the foreign representative is not exercising power pursuant to any of those statutes because he's denied right under 521A.7 the ability to exercise those domestic avoidance powers. But he also is specifically given access to those exact same avoidance powers under 1523A. And the district court made the fundamental error of saying – Yeah, but he wouldn't be proceeding in Chapter 15, right? Because 1523A says upon recognition of a foreign proceeding, the foreign representative has standing in a case concerning the debtor pending under another chapter of this title to initiate actions under Sections 522 and so on, right? So doesn't that mean that he would be intervening in a separate Chapter 7 or 11 proceeding? So two answers to that, Your Honor. One, the Code speaks specifically to what is a case pending under Chapter 15. And the provision is Section 1504 that says once the foreign representative is recognized, which has happened here, then you have a case under Chapter 15. Now, when there's a proceeding under 1523A, it can happen in two ways. One, under 1528, the foreign representative can initiate a new Chapter 7 or a Chapter 11. But even in that situation, the case is still a case under Chapter 15 within the plain text of Section 1504. The other thing that can happen – If the foreign representative kind of, you know, is surrounded by a bubble of Chapter 15 and whatever he does is in Chapter 15, that's sort of the idea? Any time you have a foreign representative standing in front of you, you have a case under Chapter 15. And that's definitionally true. And what I think is important is – so the way we would read it, there's a second instance which can happen, which is you can already have a Chapter 7 or Chapter 11 that is already existing, and then that's why it's written in terms of standing. Then the foreign representative has standing in that context. But I still think what the foreign representative is doing is a case under Chapter 15. And my friends on the other side's principle response to that is to say, well, you don't really – you get to that same result anyways, because once they were exercising avoidance powers under Title 5, then – under Chapter 5, rather, then 546E would apply of its own terms. There's two sort of problems with that. The first is 546E by its terms refers to the trustee. And so I think by having 561D say to the same extent the avoidance powers are limited, that avoids any confusion and eliminates an argument by somebody – So the whole reason for adopting 561D was because of confusion that might result from just saying the trustee in 546E? That and the confusion that could result from the fact that if you look at 1523A – Is there a weird way to accomplish that? I mean they could have just said the foreign representative shall be treated like the trustee when exercising the domestic powers. But instead it has this kind of sweeping provision that says the same limitations on avoidance powers apply to the same extent in the Chapter 15 proceeding. Your Honor, I mean – It's a lot of language to make a very small fix is what you're suggesting, right? Yeah, but if you look at the legislative history of the provision in the section by section, it says it's a clarifying amendment. I don't think it was designed to have this really dramatic effect. And if you start drilling down into my friend's position on the other side, it forces the courts to make all sorts of inquiries that the text just doesn't give you any tools to answer. Because when we say, well, all right, even if it applied to the statutory avoidance claims under BVI law, we're alleging fraud in the context of our BVI avoidance claims. My friend's response to that is, oh, but you don't actually have to prove fraud under the BVI avoidance claims because it's not an element of the claim. So if you start going to the path of avoidance powers means foreign avoidance powers, you get this inquiry that starts to look like the Armed Career Criminal Act and do we have an elements inquiry or something else. That might be the reason not to adopt that approach. I mean I'm not sure. I mean you could do it not based on a kind of elements analysis. It could be done otherwise. But I get that point. Yeah, and our point is all of those problems go away if all avoidance power means in 561D is the avoidance powers under the U.S. Code. Then everything fits together perfect. You don't have to get into this sort of analogizing foreign law. And then, of course, my friends, they're happy to analogize. If you kind of step back a bit just to think about why Congress would set it up this way, right? So Congress adopts the safe harbor because it wants to protect the expectations of U.S. shareholders who have redeemed securities, right? And they say, well, it would be crazy to have a bankruptcy proceeding that then unravels all of these redemptions, right? The paradigmatic case is that long-term capital – that's what it's called, right? Long-term capital management. Why would it make sense for Congress then to say, okay, we're going to have a Chapter 15 proceeding. We're going to have a foreign representative come in and we're going to facilitate the foreign bankruptcy proceeding, but we're going to allow them to use foreign avoidance powers to upset all of those expectations of U.S. shareholders, right? So we would be on – if it's a U.S. fund and U.S. shareholders, we don't allow it all to be unraveled. But then if it's a foreign fund, all of a sudden all the U.S. shareholders, they have to return the money they've redeemed on their investments? Why would that make sense? I mean, wouldn't – doesn't Congress just say this is not the kind of thing we would unravel in bankruptcy? So, I mean, first of all, obviously, even domestically, there are limits to what you unravel. I mean, you know, the Code doesn't treat securities exchanges in bankruptcy as sacrosanct, and you have the exception for intentional fraud. And my friend's position is we don't even get the intentional fraud claims, which can't be right, and I can talk about that later. But so even in the U.S. system, it's not sacrosanct. Also in the U.S. system, if we're right, which I think we are, that the transfers and the exceptions to the transfers, all of that just applies domestically and doesn't reach foreign transfers, then even in the U.S. system, we don't care about foreign transfers. We only care about domestic transfers, and that's all that's protected. So the treatment is parallel in the foreign case and the domestic case. And here's the third thing. But why would we not care about that, right? So this episode with the long-term capital management in the Cayman Islands, it was a Cayman Islands fund, right? And it was U.S. shareholders that had redeemed their securities and the – or sorry, I guess it's loans, whatever it was. But we didn't want the U.S. creditors to be prevented from closing on the collateral and so on. That was avoiding a foreign transaction, right, because it was money from the Cayman Islands to the United States. And that's the kind of thing that Congress wanted not to be around. So, I mean, we're a long way from long-term capital. I mean, you know, this is a private securities contract and all of that. But why is it meaningfully different? I think it's meaningfully different because I think some of the transactions that would have been protected in a long-term capital kind of thing would be domestic transfers. I think the other thing is you have to look at the limits, and you have to also factor in Chapter 15 here, because these foreign – you know, there's no 546E equivalent in the BVI proceedings. So if these proceedings take place in BVI, these foreign transfers are not going to be in any way protected. They're not sacrosanct in any way. And Chapter 15 says we want to facilitate the process of the foreign representative bringing claims in the U.S. courts. We want to facilitate the process except that these limitations will apply to the same extent in that proceeding, right? I mean, so that begs the question that we – to which we want to facilitate the process. Yeah, but it begs a couple of questions. One of the questions it begs is, all right, if in the U.S. code situation we don't go after foreign transfers, then under those circumstances it is to the same extent if we don't – if we basically say that the avoidance powers, the safe harbor, none of that stuff applies to foreign transfers. So in that sense, there's parallel. The other thing is, you know, there's a reconciliation of kind of two policy proposals, if you will, or two policy instincts. I mean, sure, 546E standing alone is, I think, domestic, but designed to protect these domestic transactions. On the other hand, Chapter 15 is trying to essentially ensure that we facilitate foreign law efforts. Now, if we get back to my best interpretation of the code, I think it works really well, because we basically say we're not going to let the foreign representative come in here, get access to Chapter 5 avoidance powers under 1523A, and then do something a domestic trustee couldn't do. But if we're in the world of the foreign representative applying foreign law under circumstances where, if they were in the foreign courts, they could disturb these transactions, we're not going to, like, erect some new barrier to that. That's inconsistent with the thrust of Chapter 15. All right, I'm sorry. What was Congress's or what's our country's interest in facilitating that type of avoidance proceeding, where you talk about how if it was in BBI, there wouldn't be these safe harbor, they'd have greater – the representatives would have greater power. What's the reasoning or the policy behind the idea that the code is intended to facilitate that, to have the foreign representatives be able to get a greater relief, admittedly under foreign law, than a trustee could get in a U.S. avoidance proceeding? So, Your Honor, just – I mean, I want to be as responsive as I can, but I don't think it's – you know, it's a matter of can they get different relief. Because the domestic trustee can't access foreign law at all, so it's just kind of apples and oranges. And what we're saying, our principal position is, you know, where you really have an apples-to-apples comparison is with the foreign representative's ability to access the domestic code provisions. And there we're saying that's apples-to-apples and they should be exactly the same. The foreign representative shouldn't have different powers. So the way I would sort of process your question is, so why do we – you know, even given that our domestic bankruptcy system doesn't allow sort of foreign law to be used to go after foreign transactions, why would we want a foreign representative to be able to do that sort of generally? And the reason we do is – you know, in a word, it's reciprocity. But it's all of the policy interests that went into the negotiation of the UNCTRAL modern law for transnational bankruptcies. You know, we want the ability for our bankruptcy system to get aid from foreign jurisdictions. And as a matter of reciprocity, we want – you know, we want to get – give reciprocity to other countries, give them access to our system. There is – I should say there's also sort of a fail-safe on all of this, which is 1508 of Chapter 15 says that the U.S. courts don't have to do anything that is manifestly against public policy. And so, you know, if there was some situation where you really thought this foreign representative's use of foreign law was doing something that was just like distinctly problematic, like going after a domestic transfer, I think you could also use 1508 to block it. So I think there is that kind of fail-safe. Let me ask a textual point. So just the parenthetical at the end of 561D where it says, such enforcement not to be limited based on the presence or absence of assets of the debtor United States, doesn't that mean that the safe harbor applies when a creditor is – a U.S. creditor is seeking to foreclose on collateral that's located outside the U.S.? I don't think it does, Your Honor, and – really. And I think if you give a close textual reading to 561D, you will see that such enforcement has an antecedent in the first half of 561D, which has its reference to enforcement. And we're really talking about the second half of 561D that doesn't talk about enforcement at all, but talks about, quote, to limit avoidance powers to the same extent as in a proceeding under Chapter 7 or 11. So I will admit to you that that parenthetical is perhaps infelicently placed, but – Sorry, so your understanding is that it applies to enforcement of contractual provisions of such contracts and agreements in accordance with their terms will not be stayed or otherwise limited by operation of any provision of this title, that part of it? Yeah, exactly. And that's – I mean, such enforcement is a classic – But that's actually not describing, you know, how the enforcement is to be conducted, such that you would need a provision that says such enforcement not to be limited. That's just saying there isn't going to be a stay. As we discussed in the briefs, Your Honor, there was like a healthy debate at the time that this was being passed about the scope of the in-rem jurisdiction of the bankruptcy courts. And that parenthetical was designed to specifically say, it doesn't matter whether the assets are in the United States, where you would obviously have in-rem jurisdiction, even if they were outside of the United States, you would have in-rem jurisdiction. But I really do think – I mean, such enforcement, to me, is just a classic language that picks up an antecedent. You can't interpret such enforcement in the abstract. And the clear antecedent is enforcement. It's nothing to do with the avoidance powers. So if I could turn to just a couple of other issues. I think you sort of – you know, happy to answer questions, but I think you have a – I have a question, which is, you know, there's this argument that the district court said, which is that the safe harbor doesn't apply to common law claims. And I get the textual arguments that are in the brief, but I have a more particular argument, which is that one of the – the notwithstanding clause refers to Section 544, right? And a trustee uses 544B1 to avoid transfers pursuant to state law. I mean, usually that is a state fraudulent transfer statute. But if you had some kind of state common law claim, right, the trustee would use 544B1 to avoid a transaction pursuant to the state common law, right? So my question is, doesn't the safe harbor actually explicitly incorporate a reference? By referencing 544, it's making clear that it also applies to avoidance pursuant to state law. Well, only in a 544 action, which is to say – I mean, and 544 for a domestic trustee is – and the preemption cases say you don't have other common law – So if the trustee brings it in officially a 544 action, or if he makes a separate, like, state common law action, you're saying that would be the distinction? And then the question – But doesn't he have to proceed under 544? Because that's what allows him to stand in the shoes of an unsecured creditor. Exactly. He can't bring a freestanding state common law claim. Well, he might be able to if for some reason it's a state common law claim that he can bring and could bring outside of bankruptcy. And there might be some of those – you know, the way I would think about it is there's common law claims that are out there. If they're the kind of claims that need to be brought under 544, then I think In re Trivune says that's preemptive and the only way you can bring them is under 544. But if there's some other common law claim with different elements that nobody would think is an avoidance action and you could bring outside of bankruptcy, the debtor could bring outside of bankruptcy, those can be brought not as sort of Chapter 5 – yeah, Chapter 5 avoidance actions. But you're saying that the safe harbor would apply to any common law claim that avoids a transaction, right? Because you're saying – Only because of preemption principles, not by its plain terms. And I think that's critical because – look, the underlying assumption – No, but I'm saying plain terms because we're talking about 544. And you're saying he has to proceed through 544 if the state common law claim is tantamount to an avoidance action. So that means that state common law claims that would avoid a transaction are under 544 and the safe harbor applies to 544. It does, Your Honor, but there are other common law claims that exist outside of 544. You just said a moment ago that those claims that exist outside of 544 are the kinds of state law claims that no one would think was an avoidance action. Right, and I think some of our claims have that feature as well, our BVI common law claims. And I would also say that you have to relax that assumption a little bit in the Chapter 15 context because, you know, if you think about the domestic context, when you're in the universe of avoidance factors, you know, my friend's position boils down to not us having powers to the same extent but to a much lesser extent because in the domestic preemption context, what you're basically saying is, look, we've got this whole system, right? We've got specific statutory avoidance powers. We have a safe harbor. And then we have an exception to the safe harbor. And so you, if you're trying in a domestic case to bring a state law claim, you don't get to do it, but you're not left without a remedy. You're certainly not left without a remedy for intentional fraud. My friend's position is the foreign representative doesn't even have a remedy for intentional fraud because their position is, and that is very clearly their position, and they say, okay, well, we're going to be sort of formalistic. We're going to be functional on the front end. We're going to say common law is kind of like a statutory avoidance power, so it's covered by 561D. But then when it gets to the point of our intentional fraud claims, and this is the principal issue in the interlocutory appeal, when it comes to the constructive fraud claims, all of a sudden they want to stop being functionalist and they want to get very formalist and say it's only 548A1A. It's nothing else. The fact that these constructive trust claims that have gone forward, even under the district court and the bankruptcy courts,  If we just say the way we should think about it is whether you actually allege intentional fraud, not about whether it's an element of the state law claim. We would be pretty happy with that result, to be perfectly honest with you. Well, depending on how we resolve other issues. Sure, and I'm happy to talk about some of those issues. One of the issues I wanted to address before I sit down is BVI common law. I also wanted to say something about the form selection agreement, so that's a healthy agenda. Okay, go ahead. Weavering 2 is a hugely important case in understanding the BVI common law. Because, you know, my friends want to rely on the Magani case. The Magani case was a preliminary issues case that went to the Privy Council and under circumstances where under the relevant law, you couldn't say anything about the underlying facts. It was just two legal issues and it was on essentially the stipulated understanding that there was no fraud. The Weavering 2 case comes out of the Cayman Islands, but it ends up in the same place, the Privy Council. And there, the whole argument of the party that was seeking to treat the NAV values as sacrosanct was Magani, Magani, Magani. And that argument lost. And it lost because there was fraud and in the colorful way that the Privy Council put it, fraud is something apart. Fraud effectively changes everything. The Privy Council in Weavering 2 describes what it held in Magani, right? And so it says in Magani the redemption liabilities were determined by the directors in good faith as the articles required. The fraud which operated on the assessment of the NAV or the NAV was external to the fund, right? And they said Magani did not address the question whether a NAV would be considered to have been determined in accordance with the articles if the directors themselves had fraudulently inflated the value of the assets. So the Privy Council is saying that if CITCO is the one that is acting in bad faith, it still doesn't make the NAVs nonbinding unless the directors themselves fraudulently inflated the value of the assets, right? No, I don't think so. It's drawing a distinction between external fraud and insider fraud, but CITCO for these purposes is clearly an insider. They are the ones that are essentially acting as agents of the fund that are putting together the NAVs. And so their fraud is attributable to the funds at some level. We can sort of sort all that out. So when the Privy Council says that the directors themselves would have to have fraudulently inflated the value of the assets, you think they're saying it could have been CITCO and not actually the directors themselves? Absolutely. And that has to be right because if you look at the facts of Weavering II, it wasn't the directors that were fraudulent. It was the principal sort of CEO of those funds. So it was the directors' agent. So it was inside in that sense, but it wasn't the directors themselves. So it's not that narrow. It's any agent of the directors. And here CITCO is the agent of the directors of the fund. So I just do think that decision is so important. I also think, you know, I'm limited in time and I want to be respectful of it, but the Section 31 argument that was relied on by the district court is really an incredibly weak argument because that is just a provision that basically says these corporate documents are genuine. It doesn't say these corporate documents are binding. Well, genuine or valid, right? Genuine or valid, right. But does valid mean binding? What does valid mean if it doesn't mean binding? You can't question the validity of a document. Doesn't that mean you can't question its binding character? No, no, you can't question its bona fides. That's what it means. And if you look at the whole of Section 31, you know, basically like the provision right – Why would I care about its bona fides if that's something separate from whether it's binding or not? Aren't I always just concerned with whether it is illegally operable or – No, the basic – look, remember, this is in the corporate code, and it's in the corporate code for a reason. It's not an insolvency provision. The insolvency provisions are much more specific, and they give the trustees voidable powers, powers to void these things. It's in the corporate code because it doesn't want to give the corporation the defense of, oh, that's not our document, that's not ours at all. And, again, I think you can understand it better if you look at the rest of the provisions. I think the corporation can say, well, we don't deny that that's our document, but we do claim that it was issued without authorization and, therefore, can be voided. Absolutely. That's exactly how it means. And also – Even though I can't contest that it's valid, I can contest whether it's voided. Yeah, or voidable, whatever the case might be. And another thing to keep in mind is, you know, this is – the provision of the code can be overridden by a contractual provision, and the relevant contractual provision here talks about the NAVs only being binding if they're in good faith. And, of course, the contract uses the term binding, not valid or genuine. So just a moment on the – Can I just ask this thing about good faith? I mean, you do talk in your complaint a lot about how the funds were victims of fraud by CITCO, but you still think that they acted in bad faith through CITCO. That's right. And the kind of – the answer to that puzzle, the way to cut that Gordian knot, is because we're the liquidators, and the BVI law, I think, is pretty clear that BVI liquidators do not sort of get saddled with all of the fraud of the company that put the company into liquidation. Well, it's not your fraud as liquidators, but it is the director's fraud. Yeah, well, I think it is – Directors were acting in bad faith. Yeah, I mean, there are some complicated questions that haven't been sorted out at this stage of the proceedings because, you know, there are three directors and only one – you know, two of them arguably had an innocent mind. I mean, those issues haven't been fully sort of sorted through at this stage of the case. And, you know, I think if we can get past motion to dismiss, we can get into some of those issues. Of course, if we got past the motion to dismiss, most of these actions would probably settle. Now, just if – I'm over time, but if – with your indulgence, just – Just make one final point. Yeah, one final point on the form selection clause. As the defendants themselves, at least, the Deutsche Bank, came and point out, the subscription agreement is the controlling document. It is literally the only document that binds the subscribers to the fund documents. Section 2 of the – Right, it's the mechanism by which they're bound by the Articles of Association. And the only one. So it's not a but-for clause. It's like the actual way they sign the Articles of Association. And it's the way they become bound by those documents. And if you look at this circuit's with respect to, or the Third Circuit, and a decision by then-Judge Alito, John Wyeth, against Cigna, 119 F3rd 1070, those with respect to is classic broadening language. It's much broader than a rising under. It's not but-for. What about the concern that that means that everything, then, ends up in New York? I don't – well, I mean, to the extent that it means all of this litigation ends up in New York, I say that's exactly why we had a form selection clause. If you take a step back, you know, not a lot other than funds and this kind of stuff is happening in the BBI. You know, when you're – and this is being offered, like, these subscription agreements are for non-U.S. subscribers. They're all over the world. What they want to do is to say, you know, if we end up in litigation, let's have it in a convenient forum. So that's your point. It's a feature and not a but. Feature, not a but. You would want everything to be in New York as opposed to chasing everything. I guess this is a case where you are suing one of your shareholders. And if there was not a form selection clause, you'd have to go to multiple countries. All over the world. And then, you know, BBI law lets you get a default judgment, but then you're chasing people all over the world trying to enforce it. It is a feature, not a but. Thank you, Your Honor. All right. I have that argument. Thank you very much, Mr. Clement. We'll hear from you again on the rebuttal. But let's first turn to the affilees, Mr. Rosenthal. Just indulge me for a moment, Your Honor. Okay. Thank you. May it please the Court. Your Honor, this case primarily boils down to one thing. Whether a foreign representative in a Chapter 15 proceeding, unlike a domestic bankruptcy trustee, can evade the safe harbor in Section 546E of the Bankruptcy Code, despite 561D saying that the safe harbor applies in Chapter 15 cases. So given the time limitations, I'm going to focus my presentation on three issues and rest on our papers for the remainder, although I'd be pleased to answer any questions that you may have on any topic. First, Section 561D of the Bankruptcy Code satisfies both steps of the Morrison test and thus applies to the settlement payments alleged here. Second, the safe harbor disposes of every claim alleged by plaintiffs. As this Court said in Tribune, the safe harbor protects transactions. And here, the basis for liability on every single claim is that the defendants receive settlement payments from and often to financial institutions in settlement of securities transactions. Plaintiffs do not plead a single claim that satisfies the sole exception to the safe harbor, whether that is limited to claims under 548A1A, as the plain language states, or even to a claim that merely requires a plaintiff to prove an intent to delay, hinder, or defraud creditors. The third issue I would address is that even if the Court were to find the safe harbor inapplicable, every one of plaintiffs' undervalued claims fails to state a claim for multiple reasons, including because the highest court for the BVI at Magani declared the net asset value upon which redemptions were paid final. And I'll go in during my argument, if we do reach BVI law, why the description you had just given of Magani and Weavering is flat-out wrong. Magani was clear that the system, it is essential to the system that settlement payments be final and irrecoverable. And also, the plaintiff's undervalued claims are also barred by BCA Section 31, which prevents plaintiffs from asserting that an NAV issued by its agent is invalid. And I'll also explain to you why what you just heard about BCA 31 is wrong. Your Honors, this is the most bizarre Chapter 15 case I've ever seen, because the BVI liquidators are suing what they allege are foreign defendants, exclusively under BVI law, over transfers they allege all occurred overseas, and they do not claim any property here in the United States. They cry comedy based on the fact that if a U.S. court applies a safe harbor that our Supreme Court in merit said is the flip side of the coin of avoidance, they will be left helpless to pursue redress. But that's only because they elected not to bring these claims in the foreign main proceeding in the BVI, where jurisdiction has not been challenged. My adversary just said that they would have to go chase people all over the world. That's not true. There is a foreign main proceeding in the BVI, and they have elected not to bring these claims in the foreign main proceeding where all of the shareholders are subject to jurisdiction, because they want to forum shop to this court, and they want to do so in the hope that this court will misapply BVI law, because these claims we all know are dead on arrival in the BVI, and that's why they're here. It hopes that this court will not apply U.S. law. So that doesn't actually affect the legal issues in this case. You're just saying that that's their strategy. They think that the U.S. courts are not going to properly apply BVI law? Well, that's why this case is here, unlike virtually any other Chapter 15 case I've ever seen, and it does weigh in the consideration of Comity, because they say, and it's throughout their papers, Comity, we are helpless if you, the U.S. court, apply the U.S. safe harbor to these claims and uphold U.S. public policy and U.S. law. Yeah, maybe, but there's a Chapter 15 proceeding, right? And, I mean, when we talk about Comity, we're talking about an interpretation of the statutes and how the presumption against extraterritoriality applies. I mean, I'm not sure that we would apply it differently if we think that, you know, they should have stuck with the main proceeding in the BVI. And I think that's a perfect introduction, Your Honor, to start with the safe harbor and the extraterritoriality analysis. So there's no dispute in this case that the transfers at issue in this appeal all meet the statutory requirements for protection under 546E of the Bankruptcy Code and that analogous claims to unsettle these transactions would all be barred if brought by a domestic trustee or even by treasurers, as the case was in Tribune. The primary issue on this appeal, then, is whether the liquidators can bring these avoidance claims in the U.S. court solely because they contend the application of the safe harbor would be impermissibly extraterritorial. And that's plainly wrong. And for convenience, I'll just refer to transactions. It's wrong because the safe harbor says the trustee may not avoid a transfer, so the focus is on the transfer, right? It's just focused on the particular transaction. It's on the transaction, as the Tribune court said. I think you said in the second point that you gave in your preview that the safe harbor exposes all claims because the statute protects transactions. I guess my thought is that it's somewhat in tension with your argument that 561D satisfies both steps of the Morrison test. So, like, if the statute protects transactions, isn't the focus of the statute the transaction as opposed to what the district court said, which is this domestic framework? Well, it's mixing issues a little bit, Your Honor, because, first of all, we satisfy step one and step two. Yeah, I know. Step one is a different question. It seems to me there's a tension between you saying, well, the statute is all about protecting transactions, but then defending the district court saying that the focus is not the transactions. Well, again, it's two different things insofar as the focus is the safe harbor. And the safe harbor is limited to U.S. court application. It's an affirmative defense. And I'll jump ahead now to the second step of Morrison, and then I'll circle back to the first step. But with regards to the focus of it, all three circuit courts that have considered extraterritoriality in the concept of affirmative defenses, including this one in the focus versus Facebook case, have found that affirmative defenses to liability under a U.S. statute in response to claims arising out of purportedly foreign conduct is a domestic application of the statute. And in contrast, I'm aware of no court at any level that has ever declined to permit the assertion of an affirmative defense in a U.S. court on the basis that its application would be extraterritorial. And as the court recently said in Nine West, the safe harbor is an affirmative defense. And while the court in force versus Facebook refrained from making a bright line rule that affirmative defenses are domestic applications, the reasoning is applicable here. And I'd just like to direct the court to what the fourth court said at page 73. The two-step framework from Morrison arguably does not easily apply to the statutory provision that affords an affirmative defense to civil liability. Indeed, it is unclear how an American court could apply such a provision extraterritorially. Even if it could be applied extraterritorially, say, by somehow treating the defendant's conduct rather than the lawsuit itself as the focus of a liability-limiting provision. The presumption against extraterritorialism. So you're saying that even though the focus is on protecting the transaction, because it ends up as an affirmative defense, the focus is actually protecting the transaction when you want to avoid it in America. So the focus, Your Honor, of the safe harbor is, and its exclusive focus, is in the U.S. court. It has no application outside of the U.S. court. Well, that's always true. Whenever we're talking about extraterritorial application of a statute, it's because a U.S. court is applying it to something, right? Well, no. Lots of times, Your Honor, it's claim-creating, not affirmative defenses. And that's a critical distinction. It's saying, for example, in Morrison, is something that somebody does in Australia going to create liability here? Or are we going to, as in RGR, are we going to extend RICO to conduct that actually occurs overseas to find somebody liable? Here, in Force, in Blasevsky, and in the recent Smith and Wesson case out of the First Circuit, it was foreign claims and U.S. affirmative defenses. And all three of those circuit courts drew a distinction and said that. I don't think we have that argument. I don't want to lose sight of what you were saying before about why the State Department would dispose of all claims. So maybe we could focus on that. Sure, I'm happy to talk about that. So Mr. Clement just said the statute talks, references specifically these domestic avoidance powers, and the concern is with the use of those powers. So why isn't that the best reading of the statute? So the best reading of the statute, Your Honor, is— First of all, does it matter whether it's the best reading of the statute? I mean, do we have a presumption that we worry about extraterritorial— No, in fact, it does matter the best reading of the statute. My adversary in his papers made repeated references to the statute needs to be unambiguous, there needs to be a clear statement of extraterritoriality. He, in fact, at one point says you don't look at the best reading. That is 180 degrees opposite of what Morrison said. Morrison said, and used the words, the most faithful reading. And then a few years later in RJR, Justice Alito— So then why don't you tell me your arguments about why it doesn't just apply, first of all, to these particular statutes, and even if it doesn't, why not just statutory avoidance powers? So two reasons for that, Your Honor. First of all, with respect to notwithstanding in the language, as the Supreme Court said in the NLRB case at 580 U.S. at 304, they said that the reading that they just promoted about notwithstanding is not the right reading. Notwithstanding is not limiting language. It just says put aside whatever we said there. You can't avoid. And that is broad language. Congress intended it to be broad language. And there's nothing that—no principle of statutory interpretation that says that because there's notwithstanding language, you now should be limiting it. And if you look at the congressional intent behind it, and the Plaintiffs' Council said, well, Congress was really just looking to make sure that it clarified the word trustee, and when it said trustee, they really meant foreign representatives here. There is a long legislative history for this statute, and none of that is in the legislative history or the statutory history. One time the Plaintiffs' Council suggested that actually even in a domestic bankruptcy proceeding, we're not very concerned about avoiding foreign transactions. And so even if we're applying it to the same extent, we can only be concerned about domestic transactions. Well, that's why Congress drafted and passed 561D in the first place. It was long-term capital management. Long-term capital management was this case. It was a foreign fund. That one was based in Cayman Islands. This one is based in BVI. And Congress was so concerned and the Fed was so concerned at the ripple effect and the fact that this foreign bankruptcy could destabilize the U.S. securities markets that it persuaded U.S. financial institutions to spend almost $4 billion to bail out long-term capital management. And then it passed this statute to make sure that if the next long-term capital management comes around, we're not going to be in a situation where a court says we're going to apply avoidance and not the safe harbors. And I go to Merit, and the Plaintiffs' Council cites Merit. And there's a key quote in Merit that really is fundamental to this case. And that quote is, the avoidance powers and the safe harbor are two sides of the same coin. And that's exactly right. And what Congress said, and they said it with respect to domestic trustees in the Bankruptcy Code. If they're two sides of the same coin, doesn't that recommend Mr. Clement's argument that we would only really be talking about the avoidance powers in the U.S. Bankruptcy Code? Because otherwise we'd have to figure out all of the scope and reach of the foreign avoidance powers. You would have to do that, actually, under their analysis. Because their analysis says domestic trustees can't reach to foreign transfers. And, therefore, they're setting up kind of two concentric circles of foreign representatives are in the foreign realm, domestic trustees are in the domestic realm. Those two circles never meet, and, therefore, 561 is meaningless. This court, actually, in Maxwell – But you're not saying there would be determined whether it's a domestic or a foreign transaction, right? I didn't catch that. I'm sorry. You're saying the confusion would be we'd have to determine whether something is a domestic or a foreign transaction? Yes. That is different from analyzing the nature of the foreign law and what powers a foreign trustee would have in a foreign bankruptcy proceeding, isn't it? But you don't need to, because it's a very, very simple, bright-line rule. Because once the court decides that Congress intended in 561D for the safe harbor to cover claims brought by foreign representatives, the question of what claims is resolved on the face of tribune, which it protects transactions, meaning if a transaction, if the basis for the – But you're saying that the statute really just says, right, you can't avoid a transfer, and then it should apply to the same extent, meaning you should look to the transaction. And so if they're trying to avoid a transaction where it's a settlement payment to an institution that meets the definition, that's the analysis. Exactly. I guess I'm wondering – I had this discussion with Mr. Clement about Section 544 that that's the mechanism by which a trustee would use state law to avoid a transaction because he can stand in the shoes of an unsecured creditor. So I guess I'm wondering what you think about that argument. Does that mean that even if we thought that the notwithstanding clause had some meaning as to the scope of the safe harbor, it actually explicitly applies to the mechanism by which a trustee would use – would assert common law claims? Well, there are different mechanisms that avoidance claims can be brought, and you're right.  But I think the key out of 544 is that the claims that get swept in there are common law claims. And they're the same – my adversary just said these are very different claims than the ones in this case. They're not. They're, as this Court grappled with in 9 West, unjust enrichment claims, for example. That's the classic one. We have unjust enrichment here. We have a constructive trust claim predicated on unjust enrichment, predicated on the receipt of an overvalued settlement payment. So can a trustee bring those kinds of claims under 544? A trustee can, and in fact often – 544B1? Absolutely, except if it's in regards to settlement of a securities transaction that meets the definition of a settlement payment. So the words in this statute, to the same extent, its most faithful and best reading is simply saying, as the Merit Management Court said, if you have an avoidance claim, and the avoidance claim as defined by this Court is going after a protected transaction, if you have an avoidance claim that the trustee cannot bring because of the safe harbor, then that same avoidance claim that a foreign representative cannot bring because of the safe harbor – it's telling me that Congress was really concerned with protecting rights within the domestic context. That's why this is a domestic application. So if I can make that inference, why shouldn't I conclude that Congress actually might have just been concerned about the use of U.S. bankruptcy powers and not foreign bankruptcy powers? So it's going to facilitate the use of foreign bankruptcy powers however much they reach, but the limitations, applying it to the same extent, is to the extent that a foreign representative gets to avail himself of domestic avoidance powers, it's going to be limited the way it would be limited for a domestic trustee. But, Your Honor, it already is without 561 at all. So what that's doing is saying that 561 accomplishes nothing, because when a trustee brings a claim under a plenary proceeding, under Chapter 7 or under Chapter 11, and that is not a claim under Chapter 15, despite what counsel for – Well, I think there's an ambiguity on that point, because we have this argument that actually everything is Chapter 15 proceeding, even if he could initiate a Chapter 7 or 11 or intervene and so on, but he's still proceeding under Chapter 15, because that's why he's in the domestic bankruptcy, right? But, again, suggesting that Congress considered over the course of about a decade after the president's working group weighed in, after a number of congressional hearings, that Congress passed 561 for the sole reason to make clear that when a domestic – when a foreign representative brings a Chapter 7 claim, he really is covered by the Chapter 7 limitations, that just is inconsistent with not only the legislative history, but they spoke in their papers, Your Honor, about – Was it unbelievable that Congress would clarify a point like that with the enactment of, like, two sentences? I mean, I don't understand. Why would that be so unbelievable? No, no, it would do so simply, and rather than over a decade with the number of hearings that it had and the statements that were made, all the statements that were made by the industry, by the president's working group, the Secretary of the Treasury, Chairman of the Fed, Chairman of the SEC, concerned about long-term capital. What he's saying was, that has nothing to do with this statute. And if we look at the statutory history, it was originally proposed as an amendment to 304. And why is that important? Because as an amendment to 304, there were no claims that they could bring under 7 or 11 at that time. The fact that that's the origin of 561, it decouples it from this entire argument that they just wanted to, as long as they're passing, you know, 1521 and 1523, to allow Chapter 7 and Chapter 11 proceedings by a trustee, well, let's make sure that when we incorporate 546 that way, that you read trustee more expansively. That came about later. So that, in my mind, collapses this entire argument. So under the current framework where the trustee, the Farm Representative can act in a Chapter 7 or 11 through Chapter 15, perhaps, it would have meaning if it limits its powers in that kind of proceeding. But you're saying because it was originally proposed when the Farm Representative had different powers, that we shouldn't understand it that way? Well, it's far broader than that. What I'm saying is, if you look at the plain language of 561D, it limits the powers completely to the same extent as a domestic trustee. And what I'm saying is, is that language, sure, it can also apply redundantly to when 11 or 7 is ordered. I have that argument. The third point you were going to address is this point about Meghani and Weavering 2. I had quoted to Mr. Clement part of Weavering 2 where it seemed to me that the Privy Council was saying that in Meghani, there had been a determination that the fraud was external to the fund. And he's saying to not resolve that. And in fact, it might be that the fraud is internal to the fund because Sitko's bad faith would be attributed to the directors. What about that? Let me answer that specific question, Your Honor, and then I'll go on to the rest of it. Look at Special Appendix 424, and it's Paragraph 13 of Weavering. And they said that the fraud was actually by somebody who had such complete control, and I think they used the word controlling mind of the company, that he was a de facto director. That's a key distinction in Weavering. But the facts of Weavering... So why is that a distinction? I mean, didn't Sitko issue the NAB certificates directly? As an outside agent. They are not the controlling mind at all. But for this purpose, as to the determination of the NABs, they are, right? They were the final say, right? They were acting on behalf of the directors, and they issued the certificates. I think the directors are still, for the company, the final say. Well, the directors could technically intervene to countermand them, but in fact they didn't, right? So the determination on behalf of the company was made by Sitko, wasn't it? But, Your Honor, there's a more fundamental flaw in this argument. And the more fundamental flaw is Magani dealt with the factual situation of when, if ever, can a company or liquidators set aside its own NAB. And Magani was not limited to specific facts, as plaintiff's counsel just said. Magani looked at this holistically and said, it cannot. It is essential that it does not, and it's irrecoverable with one exception. One exception, and then it noted that's not present here, and it's not, which is if there's a mistake, that will go to voiding of the entire contractual relationship to begin with. Weavering comes along a few years later, Your Honors, and Weavering has a completely different question. It is, when can a shareholder, when can a shareholder set aside the NAB? And Weavering said, okay, that question wasn't in Magani. Magani dealt with when the company can set aside the NAB, and it said one exception and only one exception. And Weavering says, well, because of fraud by the company's controlling mind, you can have a shareholder may, it's voidable, not void, but a shareholder may be able to set it aside, but two conditions then. You have to give back whatever you got, and you have to bring an action against the liquidators. And I would urge the court to look at paragraphs 27 and 30 of Weavering in particular, and they make very clear that that decision has nothing to do with when a company can set aside its own NAB, and I suggest that the language of Magani leaves no room for that. And that's consistent with why does it leave no room for that? I mean, it seems like we are having this debate about whether the bad faith of SIPCO is attributable to the directors or not. It doesn't seem to me that Kirby counsel answered that question. Where did they answer that question? Well, no, it didn't answer that question. But what it did was it comes- So it takes that question. I mean, but you agree that if the controlling mind or the fraud, committed the fraud, meaning like the fraud is internal to the fund, then it would be voidable, right? By shareholders. By shareholders. That's the critical distinction because what Magani says, and I'll get to then section 31 because it goes- Not only the shareholders. I mean, if in fact the directors were acting in bad faith, why can't the liquidators acting on behalf of the corpus of the funds then try to avoid- Because they say it's unworkable. It's unworkable in that situation, and in many respects. It's kind of like the safe harbor. I mean, if the directors of the fund had made an intentional fraudulent transfer, they actually just were trying to hinder or delay the recovery of other creditors, and then the liquidators tried to avoid those transactions and bankruptcy, you wouldn't say they can't do that, right? Well, there is a section under BVI law for the avoidance of fraudulent transfers, and we cite that in our brief, and there's no claim brought under that, but I'm not a BVI lawyer to be able to say whether the claim would rise- would be successful under that section. If the Articles of Association here, instead of saying the good faith of the directors, said the good faith of the directors or any agent of the directors that incorporated CITCO, then would the transactions be voidable? It would not be. It would not be still because- Even if it said, like it said expressly, that the transactions have to be made in good faith by the agent of the directors, or named CITCO in particular. Well, under both- that would be inconsistent with both Magani and Section 31 of the BCA, and my colleague said, well, Section 31, you discussed with him the meaning of the word valid, and what does valid mean, and the ordinary definition of valid is binding, and he said, no, what it really just means here is kind of you can't challenge the authority, but I encourage the court also to look at the words of Section 31, because it starts out by saying that a company may not assert against the person dealing with the company, that a document issued on behalf of the company, or by director, employee, or agent, with actual or usual authority to issue a document is not valid. So if you read valid as to say with authority, then it's just a circular redundancy. It says a document issued with authority is- you can't challenge the authority of it. And Section 31- Right, and so what about the argument that codifies the indoor management rule, it just means that you can't deny that it came from us, but then you can still debate about whether it's valid or invalid. Then it would not have this language, and in fact, Section 31-2, Section 31-2 says even in the event of fraud, this applies even- there's no authority that's been presented to the court that the statute is not read by its plain language. He's given you some arguments, and the citations were a Canadian case, an article about, I think, U.S. law, nothing about BVI law that suggests that that reading is proper, and the district court reasoned through and explained, I think quite cohesively, why that statute is applicable here. It's the same with Magani, and it actually is consistent in many respects with the fundamental policies behind our safe harbor. Now, again, you don't have to reach any of the BVI law issues if you find that the safe harbor covers all of the claims here. You only get to that if you find that it leaves some claims open. And let me tell you about why the safe harbor needs to cover the common law claims in addition to the statutory claims, because this is critical, and it underscores the reasoning of the court in Tribune and in Nine West, which is, let's take an example, just to be simple here, an example that they concede in their papers, Congress did intend for extraterritorial application, the closeout part of 561D, and I'm choosing that because that way we don't have a dispute over the application. Their argument that this statute does not cover common law claims would say that the closeout is protected, but the moment that you closeout and you take the collateral in connection with closing out a securities transaction, you are now liable for a common law constructive trust claim saying, okay, you've got our collateral, you're holding it, you now have to give it back because the common law claim isn't foreclosed. It has to go hand in hand to have any meaning. If there was a mistake in transferring the collateral and there was a mistake in payment, wouldn't you have a constructive trust claim? But that would not be to void it. Well, if there's a mistake, then the question is, it's a different one, and I don't think anybody can answer that under BDI law, whether a mistake itself can unwind a transaction. I think that the Mugane court would probably say no to that. But in a case where it's a valid closeout, nobody's challenging that this is a closeout, they had a right to do it, it's protected under 561D. If you are then saying that that party that does the closeout is subject to a common law claim, then there's no protection at all. And in the words of Nine West, it renders the safe harbor meaningless. And if I could just make one more point before I sit down, Your Honor. We can do that on the other side, too, so one final point. They argue you have to draw a distinction between statutory claims and common law claims because of comity. It's all over their briefs. It's what basically the whole interlocutory appeal is about. Respectfully, that makes no sense. The reason why that makes no sense is once you've decided that the safe harbor applies abroad, there's just no way to draw a distinction because clearly if you're worried about, well, what is the foreign country going to think about our applying the safe law? One would think first and foremost that if it's okay to say, even though you passed the statute, our safe harbor is going to apply and not let that claim be pursued under the statute. But to then say, but under comity because there's judge-made common law, that's okay and you can still achieve the same result. It's completely backwards if we're aligned. It's backwards. I mean if Chapter 15 is a recognition of a foreign bankruptcy proceeding, why couldn't we say to a foreign country, okay, if you come in and you're going to be exercising your bankruptcy powers, they're going to have to conform to U.S. bankruptcy powers in a certain way because that's the way we run bankruptcies. Exactly. But isn't it something very different to say, well, we're also going to prohibit you from having the full range of claims that's available under your law, which could give them no effect in the United States? Well, but that goes back to the point that to not do that would not protect the transaction, and that's what Congress was clearly intended, and that's how this court has repeatedly construed the safe harbor when it's been confronted with statutory and common law claims. It says if you don't bar the common law claims, you render meaningless, the words of 9 West, you render meaningless the protections of the safe harbor to begin with. Okay. Thank you very much, Mr. Roosevelt. Thank you, Your Honors, and may it please the court, just a couple of points in rebuttal. My friend started by saying that this is forum chopping, and these claims are dead on arrival in BVI because of McGonigal. None of that really matters, but let me just correct the record on that in two respects. First of all, most of these claims, or a good share of these claims, were filed in New York,  They were filed in New York City. in New York even before the Privy Council's decision in McGonigal, and it was essentially once the foreign liquidators in discovery found the subscriptions and the subscription agreement and the forum selection clause, they started bringing all of these claims to New York for all the practical reasons we were alluding to before. So it wasn't forum shopping based on fears about the law. So what's the reason not to participate in the main proceeding in the BVI but to bring it in New York? Because even though there might be jurisdiction at some level over the shareholders there, there is, once you get a judgment, then you don't have the immediate ability to execute it. You'd have to go all over the world to try to do that, and the reason you'd rather be in New York is if you get in New York, particularly under the forum selection clause, if you win, it's going to be a lot easier to execute the judgment. That's, again, why the forum selection clause picks New York in the first place. He also says our claims are dead on arrival in BVI after McGonigal. That is an argument they absolutely made to the BVI court in the Section 273 proceeding where they tried to, after McGonigal, before Weaver and True, to get an anti-suit injunction against the foreign liquidator proceeding in these courts. They made all of these arguments, including the Section 31 argument, to that court and said, you should stop this, this is dead on arrival. The BVI court said, no, we've sanctioned the foreign liquidator to do this. We've looked at claim by claim what he's allowed to bring. The sanctioning means that he's essentially entitled to his litigation fees, even if he loses. So we've looked at this, and we want it to continue to go forward. DOA is just absolutely, flatly wrong. Now, let me turn to the statutory issue. You know, my friend wants you to think about force and all of that. Ultimately, I don't think you really have to even get to these presumptions, because I do think the best reading of avoidance power in 561D is the avoidance powers under the U.S. Code. But just one word on force. Why is that the best reading? I mean, the notion of avoidance in bankruptcy has long preexisted in our actual bankruptcy code, right? Yes, but if you – I think it's a term of art. I would think of it as like the historical term of art about what would be – you know, setting aside transactions in bankruptcy. Why should I understand it as a term of art that only refers to this relatively recent innovation of statutory bankruptcy code? A couple of reasons, Your Honor. One, I think if you read the whole of the clause, it says, the avoidance powers to the same extent as the proceeding in Chapter 7 or 11 of this title. So I would logically think it's talking about the avoidance powers that are available under Chapter 7 or 11 of this title. I'd go further, though, and say, if you look at the text of 1523A, what it expressly incorporates is the ability standing to initiate actions under 522, 544, 545, 547, 548. It doesn't specifically mention 546, which is part of the reason why I think 561D is not superfluous, if it just applies to the domestic avoidance powers. But – Well, it says the foreign representative has standing to initiate actions under those sections. It wouldn't really make sense to put 546, right? Because 546 is the safe harbor. I agree. I agree. But I'm just saying the fact that it specifically addresses the powers and not the safe harbor is a reason why Congress might have wanted to clarify that the safe harbor applies when the foreign representative – That's my humble point. The third and last reason is merit management. And my friend wanted to point you to an NLRB case to figure out what the meaning of notwithstanding is. I think the better place to look is merit management itself, and I'm quoting now from the decision. The very first clause, notwithstanding sections 544, 545, 547, 548A and 1B and 548B of this title, already begins to answer the question. It indicates that 546E operates as an exception to the avoiding powers afforded to the trustee under the substantive avoidance provisions of the code, not term of art, not historical. And then just for good measure, and I appreciate it, it cites Scalia and Garner for that statutory interpretation. I want to say a word about BVI law, weavering to – I think this is important. I think the important phrase that informs our colloquy about whether this is an internal or external fraud is on page 13 of the decision, SPA 430. This is the Privy Council, and I quote, What matters in this case is that valuations were prepared on a fraudulent basis by the person to whom the directors had given actual authority to carry out the valuations. In that case, that was Magnuson-Peterson. In our case, that's CITCO. It is absolutely apparent. Is that what you're referring to as Mr. Rosenthal said it was the shareholder that was trying to invalidate the transaction? Not one bit, Your Honor, and that's because this is a liquidation. That might be an interesting argument, an interesting debate for some BVI lawyers if this was a claim that was brought by the corporation outside of liquidation. But, you know, if you look at the statutory provisions, for example, 246, 247, those are under a part of the BVI insolvency code about voidable transactions. It makes crystal clear the liquidator has the ability to treat these kind of transactions as voidable, just like a shareholder is. And, of course, we're not here to enrich Mr. Criss. We're here to ultimately recoup some money to the shareholders who have lost their life savings. Thank you, Your Honor. Thank you very much, Mr. Clement. And we'll turn again to Mr. Rosenthal on a surrebuttal. So, Your Honor, I believe my surrebuttal is, you know, limited to the cross- That's okay. You can use your minute however you like. Okay. So, Your Honor, with regard to the Weavering decision, again, we don't need to get there because I believe that the extraterritorial effect of the safe harbor is established for both steps. But if you do get there and you look at the Weavering decision, it doesn't matter. There's nothing in the decision that says that this is applicable because it's a liquidation. And, in fact, the liquidator in that said, no, this is binding. You have to uphold the calculation of the NAV and the shareholder who was challenged. It's a weird case because the shareholder was saying- But if it's a weird case and it doesn't address this question, then maybe it's unresolved and we don't know. But it's not unresolved. It's resolved in Magani. And they're saying, no, no, Weavering leaves. It disturbs the Magani decision. And Magani, because Magani did not- it was kind of factless. And that's why they declared it is irrecoverable. It is essential that it be final. And then they said, in a vacuum, without regard to specific facts, there is one set of facts that it would not be so. And they pronounced what it would be. If one set of facts that it would be nonbinding on the company were fraud, it would have said so. But it said there is one set of facts that we could have here. So it was not limited to the facts of Magani, as was presented on the papers. Thank you, Your Honor. Thank you very much, Mr. Rosenthal. The case is submitted.